IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MICHAEL TAYLOR            )
                          )
v.                        )    No. 3:06-0596
                          )    Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION    )


To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits ("DIB") and supplemental security income
("SSI"), as provided under Titles II and XVI of the Social
Security Act ("the Act"), as amended.  The case is currently
pending on plaintiff's motion for judgment on the administrative
record (Docket Entry No. 14), to which defendant has responded
(Docket Entry No. 21).  Plaintiff has further filed a reply brief
in support of his position (Docket Entry No. 22).  Upon
consideration of these papers and the transcript of the
administrative record, and for the reasons given below, the
undersigned recommends that plaintiff's motion be DENIED, and
that the decision of the Commissioner be AFFIRMED.

1

Plaintiff filed his DIB and SSI applications on January 2, 2002, alleging the inability to work as of November 1, 2001 (Tr. 112-17, 350-52).  These applications were denied at the initial and reconsideration stages of administrative review before the state agency (Tr. 85-88, 89-93, 96-97, 355-62). Plaintiff thereafter requested and received a *de novo* hearing before an Administrative Law Judge ("ALJ"), who heard the case on July 27, 2004 (Tr. 363-400).  Plaintiff was represented by counsel at the hearing, and testimony was received from both plaintiff and an impartial vocational expert ("VE").

On October 14, 2004, the ALJ issued a written decision denying plaintiff's claims to benefits (Tr. 71-77).  The decision contains the following enumerated findings:

1.  The insured status requirements of the Act were met as of the alleged onset date.

2.  No substantial gainful activity has been performed since the alleged onset date.

3.  The claimant has no "severe" impairments.  The claimant has the nonsevere impairments of obesity and tendonitis in the left elbow.

4.  The subjective allegations of disability are not credible.

5.  The claimant has not been under a disability through the date of this decision.

(Tr. 76-77)

On April 5, 2006, the Appeals Council denied

2

plaintiff's request for review of the decision of the ALJ (Tr. 7-9), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

## II.  REVIEW OF THE RECORD

The following record review is taken from defendant's brief (Docket Entry No. 21), and is not materially opposed by plaintiff (Docket Entry No. 22 at 1-2).

### A.  Medical Evidence

Plaintiff was seen at the hospital on June 28, 1996, for left elbow pain (Tr. 39-41). He stated that he had difficulty moving his left hand, fingers, and shoulder, and he was diagnosed with left elbow bursitis (Tr. 39-41). He was next seen at the hospital on December 27, 1998, for gastric symptoms and was diagnosed with, and treated for, dyspepsia (Tr. 42-43).

On April 7, 1999, he was seen for sinusitis by his treating physician, Ben Shoemaker, M.D., of the Horizon Medical Group (Tr. 48). On April 26, 1999, plaintiff was again seen for complaints of continuing right shoulder pain and ankle swelling.

3

Id.  Lab work was ordered and he received Darvocet and Anaprox.[1]
Id.  Plaintiff returned on April 28, 1999, and was seen by
another physician within Horizon Medical Group, Jeff Lundy, M.D.,
for complaints of right shoulder pain (Tr. 49).  Dr. Lundy noted
ankle swelling and tentatively diagnosed arthralgia and
arthritis, and he prescribed Lodine, Kenalog, and Dexamethasone
IM.[2]

Plaintiff was seen on May 11, 1999, by James R.
Anderson, M.D., of the Columbia Medical Group, for arthritis
symptoms (Tr. 50).  He was prescribed Celebrex and Bentyl,[3] in
addition to Lodine, and he was referred to a rheumatologist.  Id.
On June 21, 1999, Dr. Anderson diagnosed arthritis in the right
ankle and foot, and he prescribed Lortab[4] (Tr. 51).

Plaintiff was next seen on June 25, 1999, by Jeffrey P.
Lawrence upon referral by Dr. Anderson (Tr. 52-53).  Dr. Lawrence
noted that an x-ray showed early degenerative changes in the
ankles and large heel spurs.  Id.  He diagnosed ankle
osteoarthritis, heel spurs, and plantar fasciitis, and he

---

[1]Darvocet is another name for Percocet, a narcotic and analgesic pain
reliever; Anaprox is another name for Ibuprofen, a nonsteroidal anti-
inflammatory drug ("NSAID").  The Pill Book ("Pill Book") 888, 553 (CMD
Publishing, 12th ed. 2006).

[2]Lodine is an NSAID; Kenalog is a topical corticosteroid; and
Dexamethasone IM is a corticosteroid eye product.  Pill Book at 454, 314, 294.

[3]Celebrex is an NSAID, and Bentyl is a drug prescribed for irritable
bowel.  Pill Book at 203, 348.

[4]Lortab is another name for Percocet.  Pill Book at 825.

4

prescribed exercises and ankle supports. Id. He advised plaintiff to avoid squatting and climbing, and to take Tylenol. Id.[5]

Plaintiff returned to Dr. Shoemaker on April 3, 2000, with complaints of abdominal cramping (Tr. 272). Dr. Shoemaker diagnosed anxiety and prescribed Zoloft. Id. On July 11, 2000, plaintiff was seen at the hospital for acute pharyngitis and was prescribed an antibiotic (Tr. 58-61).

Plaintiff was seen at the hospital on August 3, 2000, after experiencing an electrical shock while on the job as a welder's helper (Tr. 62-66, 348-349). Plaintiff denied feeling pain but said he felt weak and slightly numb. Id. Plaintiff returned to the hospital on August 13, 2000, with complaints of a headache, which was diagnosed as a tension headache (Tr. 67-70, 342-343).

On December 20, 2000, plaintiff returned to the hospital and was diagnosed with neuralgia in both arms (Tr. 294-299, 340-341). On January 27, 2001, plaintiff was again seen at the hospital for complaints of pain in the left arm and shoulder and numbness in the left fingers, which he said felt like a "nerve pinch" when he flexed his wrist, and which he felt were the result of his electrical shock (Tr. 283-287, 338-339). He

---

[5]On July 21, 1999, plaintiff went to the hospital for removal of a tick (Tr. 54-55). He was seen on March 8-9, 2000, for gastroenteritis (Tr. 57, 274), and he was treated for viral syndrome on March 14, 2000 (Tr. 273).

was diagnosed with left arm neuritis and left hand carpal tunnel syndrome, prescribed Naprosyn and a Medrol Dose Pack,[6] and given an orthopedic referral. Id.[7]

A year later, on December 28, 2001, plaintiff was seen at the hospital for complaints of pain in the left arm that were ascribed by plaintiff to the electrical shock incident one year earlier (Tr. 289-293). He was diagnosed with arm pain and tendonitis, and he was prescribed Prednisone[8] and Lortab. Id. He was told not to drive while taking Lortab. Id.

On February 19, 2002, consultative examiner Albert J. Gomez, M.D., examined plaintiff at the request of the Disability Determination Services ("DDS") of Tennessee (Tr. 300-302). Dr. Gomez characterized the examination as normal, noting that plaintiff weighed 232 pounds and was five feet nine and one-half inches tall. Id. Dr. Gomez diagnosed chronic elbow pain, tendonitis, and obesity (Tr. 300-302).

On February 20, 2002, plaintiff underwent a consultative psychological examination by Thomas L. Pettigrew, Ed.D. (Tr. 303-305). He diagnosed plaintiff with alcohol abuse

---

[6]Naprosyn is another name for Ibuprofen, and Medrol is an oral corticosteroid. Pill Book at 553, 306.

[7]There is no record of a subsequent orthopedic visit. However, on February 26, 2001, plaintiff was seen for headaches and a cold; on February 26, 2001, he was diagnosed with acute sinusitis and bronchitis (Tr. 271, 278-282).

[8]Prednisone is an oral corticosteroid. Pill Book at 306.

6

(status unknown), observed passive-aggressive behavior, and deferred a medical diagnosis. Id. Dr. Pettigrew noted that Mr. Taylor did not allege complaints related to depression, anxiety or other functional symptoms or psychological symptom disorders, but was evasive and manipulative and showed "marked passive resistance, evasiveness, and manipulation" during attempted psychometric testing. Id. Dr. Pettigrew made several attempts to administer the test but was unable to do so successfully, and he estimated plaintiff's intellectual functioning to be in the low average range (I.Q. of 80-89). Dr. Pettigrew found no evidence of impairment to plaintiff's ability to understand, remember, and carry out simple verbal instructions and no evidence of cognitive problems, but he did not find him capable of managing disability funds (Tr. 303-305).[9]

On January 16, 2003, plaintiff was taking hypertension medication (Tr. 328). On October 2, 2003, plaintiff was seen for complaints of pain with movement in the left shoulder and occasional back pain (Tr. 324). Family Nurse Practitioner ("FNP") Sandra R. Ermini noted that plaintiff denied any dizziness, syncope, headaches, weakness, or tremors, but did allege occasional numbness in the left forearm and hand. Id. FNP Ermini also wrote that plaintiff denied depression, anxiety,

---

[9]The ALJ posited that the assessment of incapability to manage funds was likely related to the unknown status of plaintiff's alcohol abuse (Tr. 392).

7

or insomnia, but stated he was "occasionally forgetful." Id.
FNP Ermini observed bilateral nonpitting edema in the ankles and
found muscle strength of 5/5 in the upper and lower extremities.
Id.

On October 18, 2003, FNP Ermini wrote that plaintiff
had had hypertension since 1999 and now had swollen ankles,
tendonitis in the left upper extremity, carpal tunnel syndrome in
the left upper extremity, and bursitis in both shoulders (Tr.
325). She discontinued the medication Diovan and prescribed HCTZ
and Prevacid.[10] She assessed plaintiff with gastroesophageal
reflux disease ("GERD"), hypertension, lower extremity edema, and
left shoulder pain (either bursitis or rotator cuff), allergic
rhinitis, a disorder of the right thumbnail, and a right temple
skin lesion, and she noted that plaintiff had no insurance. Id.
On February 9, 2004, plaintiff went to the hospital for viral
gastroenteritis and was treated with Phenergan[11] (Tr. 56).

On July 21, 2004, plaintiff's attorney arranged for a
psychological assessment with Kenneth Anchor, Ph.D, ABPP (Tr.
322-323). Dr. Anchor wrote that plaintiff had a "childlike
manner" with speech that was hard to understand, and he noted
marked difficulties in comprehending and following test
instructions and completing tasks in a timely manner. Id.

_____

[10]Diovan and HCTZ are anti-hypertensives; Prevacid is prescribed to
control stomach acid. Pill Book at 85, 899.

[11]Phenergan is an antihistamine. Pill Book at 884.

8

Plaintiff's full-scale IQ score was measured at 67, the mild range of mental retardation, and Dr. Anchor opined that plaintiff had been "the beneficiary of social promotions" in school. Id. Dr. Anchor found marked deficiencies in mental alertness, problem solving skills, and attention to detail, and he found plaintiff to be functionally illiterate and "highly distractible and unable to sustain attention or concentration for any extended period." Id.

In a letter dated October 4, 2004, Dr. Anchor wrote that plaintiff's cognitive function limitations, including "pronounced neurocognitive deficits," were due to the 2000 electrocution incident (Tr. 330-331). He also wrote that plaintiff showed a memory impairment and had "consistently scored at the lower end of the various tests he took as a youth and as an adult," would be unable to do jobs he once did, was experiencing an "ongoing deterioration" due to the aging process, and would benefit from a program of cognitive rehabilitation, though such a program might only slow the process of cognitive deterioration, rather than stopping it altogether. Id.

B. Vocational and Other Evidence

Plaintiff was born on March 11, 1952 (Tr. 112), and was 52 years old at the time of the ALJ's decision (Tr. 74). He had completed the twelfth grade (Tr. 74, 136). Plaintiff lived with his wife and 11-year old daughter (Tr. 369-370). His wife mowed

9

lawns and babysat to earn income for the family (Tr. 370).

According to a February 15, 2002, report by plaintiff of his activities of daily living,[12] plaintiff had pain in the arms and legs that began when he was electrically shocked at work in 2000 (Tr. 152-159). He alleged that his hand and arm became numb and he was unable to hold anything. Id. He wrote that he was a "slow learner," had problems with concentration and memory, could not sleep at night, and sometimes thought of ending his life. Id. He wrote that he did not use alcohol, was able to prepare bacon and egg sandwiches, helped his wife vacuum and clean the bathroom, and went shopping with his wife for groceries. Id. He claimed to have no hobbies, but he wrote that he watched television and listened to the radio all day long. Id. He indicated that he got along well with others, and he wrote that he had attended special education classes for problems with reading. Id.

In a July 10, 2002 report of his activities of daily living, plaintiff wrote that he spent his days sleeping and watching television and his wife prepared his meals (Tr. 194-204). He stated that he could not "think well" because he was "born with a learning disability" and was now "even slower" after his electrocution. Id. He alleged "difficulty finishing tasks

---

[12]The transcript of the administrative record contains a copy of the daily activities questionnaire, but plaintiff's responses are illegible. A legible copy has been produced by the government and filed as a supplement to the transcript, at Docket Entry No. 20.

10

because of difficulty reading and comprehending.  I also am slow so even if someone explains something to me, I have trouble understanding things people tell me.  I can only read to about the 2nd grade level."  Id.  He claimed to have one good day in three months, but he wrote that most days were centered around his pain and numbness.  Id.

Plaintiff completed the twelfth grade (Tr. 136).  On his "Disability Report - Adult" (Tr. 136), plaintiff indicated that he had not attended special education classes, and his school records appear to confirm this, though it appears he received some form of tutoring or extracurricular help with reading.  See Docket Entry No. 22 at 2.

Plaintiff's work history included work as a cook on active duty in the U.S. Army from May 30, 1971, to January 1, 1972, and then in the Reserves for the next 28 years (Tr. 366-367).  He also held jobs stocking paint in a paint factory from 1972 to 1975, hanging interstate signs from 1975 to 1977, delivering plumbing supplies and appliances by truck from 1977 to 1990, welding boat cables from 1993 to 1996 and again in 1999 and 2000, doing plumbing work, including pipe installation, from 1989 to 1992, and driving a truck from 1999 to 2001 (Tr. 112, 131, 144-150).

11

III.  CONCLUSIONS OF LAW

A.  <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  <u>Landsaw v. Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  <u>Bell v. Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached.  <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined.  <u>Hurst v. Sec'y of Health & Human</u>

12

<u>Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[13] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.
(5)  Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the

_____

[13]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

13

existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

14

C. <u>Plaintiff's Statement of Errors</u>

Plaintiff argues that the ALJ erred in denying benefits at step two of the sequential evaluation process, upon a finding of no severe impairments. Plaintiff further charges error in the ALJ's discrediting of the report of Dr. Anchor, as well as his finding that plaintiff's complaints of disabling limitations are not credible. As explained below, the undersigned finds no error in the ALJ's finding of no severe impairment, and therefore no disability.

The step two severity determination has been described by the Sixth Circuit Court of Appeals as "an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." <u>Higgs v. Bowen</u>, 880 F.2d 860, 863 (6th Cir. 1988)(<u>quoting</u> <u>Farris v. Sec'y of Health & Human Servs.</u>, 773 F.2d 85, 90 n.1 (6th Cir. 1985)). The court in <u>Higgs</u> recognized that claims which obviously lack medical merit are appropriately dismissed at this step of the sequential evaluation process, "because in such cases the medical evidence demonstrates no reason to consider age, education, and [work] experience." <u>Id.</u> at 862-63 (<u>citing</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137 (1987)). For its part, the Social Security Administration has promulgated rulings on the subject which bind its decision makers to execute agency policy as interpreted therein, including the following pertinent language from the ruling entitled "Medical Impairments

15

That Are Not Severe":

The severity requirement cannot be satisfied when
medical evidence shows that the person has the ability
to perform basic work activities, as required in most
jobs. Examples of these are walking, standing,
sitting, lifting, pushing, pulling, reaching, carrying
or handling; seeing, hearing, and speaking; understanding,
carrying out, and remembering simple instructions; use
of judgment, responding appropriately to supervision,
coworkers, and usual work situations; and dealing with
changes in a routine work setting. Thus, these basic
work factors are inherent in making a determination
that an individual does not have a severe medical
impairment.

Although an impairment is not severe if it has no more
than a minimal effect on an individual's physical or
mental ability(ies) to do basic work activities, the
possibility of several such impairments combining to
produce a severe impairment must be considered. . . .
A claim may be denied at step two only if the evidence
shows that the individual's impairments, when
considered in combination, are not medically severe,
i.e., do not have more than a minimal effect on the
person's physical or mental ability(ies) to perform
basic work activities. If such a finding is not
clearly established by medical evidence, however,
adjudication must continue through the sequential
evaluation process.

. . . A determination that an impairment(s) is not
severe requires a careful evaluation of the medical
findings which describe the impairment(s) and an
informed judgment about its (their) limiting effects on
the individual's physical and mental ability(ies) to
perform basic work activities; thus, an assessment of
function is inherent in the medical evaluation process
itself. At the second step of sequential evaluation,
then, medical evidence alone is evaluated in order to
assess the effects of the impairment(s) on ability to
do basic work activities. If this assessment shows the
individual to have the physical and mental ability(ies)
necessary to perform such activities, no evaluation of
past work (or of age, education, work experience) is
needed. Rather, it is reasonable to conclude, based on
the minimal impact of the impairment(s), that the
individual is capable of engaging in [substantial

16

gainful activity].

                              * * *

    Great care should be exercised in applying the not
    severe impairment concept.  If an adjudicator is unable
    to determine clearly the effect of an impairment or
    combination of impairments on the individual's ability
    to do basic work activities, the sequential evaluation
    process should not end with the not severe evaluation
    step. . . .

Soc. Sec. Rul. 85-28, 1985 WL 56856, *3-4 (S.S.A.).

        Plaintiff's disability claim is based on alleged

impairments to his heels/ankles and his left arm, as well as

alleged mental retardation.  Regarding plaintiff's heels and

ankles, the ALJ found no x-ray or other medical evidence

confirming the existence of bone spurs in the heels, as alleged

by plaintiff (Tr. 75).  The government in its brief characterizes

this finding as harmless error by the ALJ, since the medical

record does reflect at least a diagnosis of large heel spurs that

purports to be based on x-ray results (Tr. 53), if not the

radiology report itself.  There is also evidence, dated prior to

plaintiff's alleged onset of disability, which establishes the

existence of arthritic pain and swelling (edema) in the ankles

and plantar fasciitis (Tr. 49, 51-53), as well as evidence dated

after plaintiff's alleged onset date which reflects plaintiff's

history of experiencing constant swelling in his ankles, but

without any current complaints noted (Tr. 301, 324-26, 328).

Plaintiff's physician prescribed Diovan in order to combat both

                              17

his high blood pressure and the ankle swelling, though plaintiff appears to have taken this medication largely as samples from his physician when he could get them (Tr. 325-26). Despite these few items of medical proof, the ALJ aptly noted the absence of any objective evidence of functional restriction related to plaintiff's feet and ankles. The undersigned must conclude that the ALJ's failure to recognize the medically determinable impairment of heel spurs is indeed harmless error, and that the scant notations of ankle swelling in the medical records, combined with the consultative examiner's finding of full range of motion in the ankles and otherwise normal functioning in the lower extremities (Tr. 301), are consistent with the ALJ's finding of no severe impairment.

Plaintiff's left arm impairments have been diagnosed as neuritis (Tr. 283), carpal tunnel syndrome (Tr. 286), tendonitis (Tr. 293), neuralgia (Tr. 296), and bursitis (Tr. 325, 327). As recognized by the ALJ, it is clear that plaintiff endures some degree of periodic discomfort in his left arm, whether it be his wrist, elbow, shoulder, or a combination thereof. However, it is also clear that the scant medical evidence dated after the alleged date of disability onset does not support a finding of a severe impairment, as his physicians have not assigned any particular restrictions against use of the arm, and have prescribed only conservative measures for relief of pain (i.e.,

18

over-the-counter ibuprofen (Tr. 325)), aside from one three-day supply of the narcotic Lortab prescribed by an emergency room physician in December 2001 (Tr. 132, 135, 293). In view of this evidence, as well as the consulting physician's finding of a full range of shoulder, elbow, and wrist motion and no motor strength, grip strength, or reflex loss related to plaintiff's chronic elbow pain (Tr. 301-02),[14] it appears that substantial evidence supports the ALJ's finding of only the nonsevere impairment of left elbow tendonitis.

Regarding plaintiff's alleged mental impairment, which he testified is foremost among the problems that keep him from working (Tr. 374), there are only two items of medical evidence from examining sources. The first is the assessment of the consulting psychologist, Dr. Pettigrew, who evaluated plaintiff on February 20, 2002 (Tr. 303-05). Upon interviewing plaintiff, Dr. Pettigrew made the following observations:

> ...He was alert and oriented to time, place, person and circumstance. His affect was bright. He was further noted to have clearly articulated and fluent speech with non-defective vocabulary and syntax skills. His presentation was definitively unremarkable for signs of mental retardation and dementia.
>
> Mr. Taylor had no complaints related to depression, anxiety or other functional symptoms or psychological symptom disorders. During the psychological interview he impressed the examiner as quite evasive and

---

[14]Plaintiff's treating nurse practitioner similarly found no swollen or inflamed joints, tenderness to palpation, or neurological deficits; however, she did observe a "painful arc" with range of motion testing of plaintiff's left shoulder, for which ibuprofen was recommended. (Tr. 324-25)

manipulative and, when psychological testing was
attempted, marked passive resistance, evasiveness and
manipulation were encountered.  Indeed, the magnitude
of his resistance was such that after attempts to
administer several of the WAIS-III subtests the
examiner made the decision to discontinue.  In this
examiner's professional opinion, Mr. Taylor's minimum
intellectual functioning currently lies within the Low
Average range (IQs 80-89).

...He is entirely independent in meeting all aspects of
his personal needs.  He drives alone to stores and
other public places and is able to conduct personal
business and manage money independently.  He reported
involvement in the care of his daughter and also
assists with meal preparation.  He eats at restaurants
occasionally, watches television, makes and received
telephone calls, visits relatives, etc.

...There is no evidence of any impairment in this
gentleman's ability to understand, remember or carry
out simple verbal instructions.  Although his
cooperation and motivation were insufficient to produce
valid scores on psychometric testing, the examiner
noted no evidence of any cognitive problems which could
be attributed to an actual cognitive deficit or a
diagnosable psychological symptom disorder.

(Tr. 304-05)  Upon reviewing Dr. Pettigrew's report of

plaintiff's passive-aggressive resistance to testing and

manipulative behavior, and noting the absence of any history of

seeking mental health treatment, a nonexamining state agency

consultant found no evidence of any medically determinable mental

impairment[15] (Tr. 306-19).

        Diametrically opposed to Dr. Pettigrew's report is the

_____

        [15]A medically determinable mental impairment is one which results from
psychological abnormalities that can be shown by medically acceptable clinical
and laboratory diagnostic techniques.  20 C.F.R. § 404.1508.  Before the
severity of a claimant's symptoms may be gauged, those symptoms must be linked
to a medically determinable impairment capable of producing them.  Soc. Sec.
Rul. 96-3p, 1996 WL 374181, *2 (S.S.A.).

report of Dr. Anchor, who evaluated plaintiff on July 21, 2004,

upon referral by plaintiff's counsel (Tr. 322-23). Dr. Anchor

reported as follows:

> Mr. Taylor was driven to the evaluation by his wife.
> His manner is childlike. His speech is difficult to
> understand. Marked difficulties in comprehending and
> following test instructions and completing them in a
> timely manner were demonstrated.
>
> Mr. Taylor achieved a full-scale I.Q. test score of 67
> (Verbal - 68, Performance - 70) which placed him in the
> mild range of mental retardation at about the second
> percentile of the general population. Achievement test
> scores indicated that the patient is reading at the 2nd
> grade level; spelling at the first grade level and
> performing arithmetic at the third grade level. Though
> Mr. Taylor reported that he completed 12th grade, he
> appears to have been the beneficiary of social
> promotions as he explained: "the only way I got
> through was my guidance counselor talked to teachers to
> tell them - let him do whatever he could do or
> whatever." Mental alertness[,] problem solving skills
> and attention to detail are markedly deficient. The
> patient is highly distractible and unable to sustain
> attention or concentration for any extended period.

(Tr. 322-23) Dr. Anchor concluded by finding the aforementioned

test scores to be valid, and noting that plaintiff should be

considered to be functionally illiterate and incompetent to

manage any benefits awarded (Tr. 323). In a subsequent letter,

Dr. Anchor opined that plaintiff "was probably able to compensate

for his longstanding cognitive limitations" prior to the year

2000; "[h]owever, the sequelae of the electrocution were

sufficiently severe to contribute significantly to pronounced

neurocognitive deficits." (Tr. 330) Dr. Anchor further revealed

that plaintiff's "serious memory impairment" was of central

importance to his reduction in cognitive functioning, and that, as demonstrated by Dr. Anchor's prior research and publications, plaintiff's cognitive functioning stood to deteriorate with the aging process (Tr. 330-31). Dr. Anchor therefore "surmise[d] that [plaintiff's] cognitive functioning at the time of our testing was perhaps the lowest he had ever experienced in his life." (Tr. 331)

However, there is no medical or other evidence to corroborate this suspicion of a precipitous decline in plaintiff's memory or overall intellectual functioning in the 2½ years between the time of the examination by Dr. Pettigrew and that of Dr. Anchor, nor was the ALJ bound to accredit Dr. Anchor's citation to his prior, published research as proving the point. Both of these psychological evaluations were completed after plaintiff's "electrocution" in June of 2000, which Dr. Anchor deemed the most significant disruption to plaintiff's cognitive functioning (Tr. 330). In light of the regulatory and medical definition of mental retardation, plaintiff's history of performing skilled and semi-skilled work, and, in particular, the fact that the *diagnosis* of mild mental retardation was not in fact given by Dr. Anchor, it is perfectly clear that substantial evidence supports the ALJ's finding that plaintiff does not suffer from that severe impairment (Tr. 76). In the absence of any actual psychological diagnoses, and with only the raw

22

evidence of reduced intellectual functioning provided by Dr. Anchor's report of plaintiff's WAIS-III scores and clinical presentation (which, again, is diametrically opposed by the observations of and presentation to Dr. Pettigrew), it is not clear that the record supports the existence of any medically determinable mental impairment, much less a severe mental impairment. The ALJ noted that neither Dr. Pettigrew nor Dr. Anchor was a treating psychologist, and that the weight of the record evidence, including plaintiff's prior work history,[16] supported Dr. Pettigrew's assessment of intellectual functioning in at least the low average range, despite plaintiff's rather poor academic record and testimony as to his limited mental ability (Tr. 76). It was for the ALJ to resolve the dramatic conflict in the medical evidence here, and substantial evidence supports his resolution. Accordingly, the undersigned finds no error in the ALJ's failure to recognize a severe (or even nonsevere) impairment to plaintiff's cognitive functioning.

In sum, while the ALJ could have justified proceeding with the sequential evaluation process out of an abundance of caution, his analysis does not reveal any reversible error in failing to do so. Though the second step of the disability evaluation presents a low threshold, it is nonetheless

---

[16]It is worth noting here that plaintiff does not allege the inability to work until November 2001, some sixteen months after receiving the electrical shock.

23

plaintiff's burden to prove the medical severity of his
impairments, a burden he has failed to carry on this record.  The
absence of sufficient medical evidence to show a severe
impairment as the basis for the alleged disability ends the
inquiry; therefore, the charge of error in the ALJ's evaluation
of plaintiff's subjective credibility need not be addressed.  The
undersigned concludes that the Commissioner's decision should be
affirmed.


IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge
recommends that plaintiff's motion for judgment on the
administrative record be DENIED, and that the decision of the
Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report
and Recommendation in which to file any written objections to it
with the District Court.  Any party opposing said objections
shall have ten (10) days from receipt of any objections filed in
which to file any responses to said objections.  Failure to file
specific objections within ten (10) days of receipt of this
Report and Recommendation can constitute a waiver of further
appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140
(1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en
banc).

24

Case 3:06-cv-00596  Document 23  Filed 11/02/07  Page 24 of 25 PageID #: 134

plaintiff's burden to prove the medical severity of his
impairments, a burden he has failed to carry on this record.  The
absence of sufficient medical evidence to show a severe
impairment as the basis for the alleged disability ends the
inquiry; therefore, the charge of error in the ALJ's evaluation
of plaintiff's subjective credibility need not be addressed.  The
undersigned concludes that the Commissioner's decision should be
affirmed.


IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge
recommends that plaintiff's motion for judgment on the
administrative record be DENIED, and that the decision of the
Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report
and Recommendation in which to file any written objections to it
with the District Court.  Any party opposing said objections
shall have ten (10) days from receipt of any objections filed in
which to file any responses to said objections.  Failure to file
specific objections within ten (10) days of receipt of this
Report and Recommendation can constitute a waiver of further
appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140
(1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en
banc).

24

**ENTERED** this 2nd day of November, 2007.

                   s/ John S. Bryant

                  JOHN S. BRYANT
                  UNITED STATES MAGISTRATE JUDGE